in 15-2080 Alfredo Violdo et al. versus Fidel Castro Ruz et al. May it please the court, my name is Andrew Hall. I have the pleasure of representing the appellants in this matter. I request three minutes reserved for rebuttal. This case involves a number of issues. First of all, when a judgment becomes a final judgment. It involves the application of Rule 58 and 59 in that regard. It involves whether or not the judgment in this case can be enforced against certain assets and the protocol procedures that were filed in that enforcement. And whether or not the district court was correct in determining that the enforcement of the judgment against the assets in particular were consistent with the public policy of the United States as compared to enforcing the judgment. And finally there's the issue of the attorney's fees that the trustee claims are due to him. Let me just walk through the most important factual history of the case. In 2011, the Violdos recovered a judgment as victims of terrorism by the government of Cuba. The judgment was 2.9 billion dollars in its entirety. That judgment was taken to federal courts and recognized as having full faith and credit in the Southern District of New York on two occasions. In the Northern District of New York and the Western District of Pennsylvania and in the District of Massachusetts. With regard to the issues in this case, this case commenced with an effort to discover what assets were held in this district by the putative defendant computer share as a uninterested stakeholder. In response to that subpoena, the Violdos learned that there were three classes of securities that they were holding. One class was what's called book shares, which is the electronic shares. There was currency and then there were certificated shares. Each one of them are owned separately. There were a total of over 390 accounts involving 70 people. When that information was learned, the proceeding commenced with an application on December 2, 2013 to begin the turnover process. In that regard, on December 11, 2013, there was an order entered, which contemplated a notice protocol, and that notice protocol becomes very fundamental in understanding how the rights of all parties were affected. The reason I say that is because there are four possibilities of what happens with respect to these assets in question. The first possibility is that these 70 individual accounts are recognized and these account holders theoretically might have a legitimate objection to what occurred with their account. So in that regard, each of the 70 account holders were given actual notice by letters to their last known address in Cuba, coupled with two advertisements in English and Spanish, coupled with two advertisements in the Herald Tribune, which is published worldwide. In point of fact, there was one timely objection as to one account holder and two untimely objections. We announced to the court below that we would not be seeking those monies. So with respect to the other 67 account holders, they have essentially abandoned their interest or recognized the right of Cuba as being paramount. The second claimant is Cuba. Cuba received, as required by the court's direction, a notice of this intended taking in enforcing the judgment. The third issue. Where else would it go other than to the plaintiffs to satisfy their judgment? The contention, I guess, is that it should remain in limbo forever and at some point is cheat to the state of Massachusetts because nobody has any claim to the funds, which is a nonsensical conclusion. So in that context, what occurred was the notice protocol was given and then moving forward, the time for objections expired on January 31st, 2014. As I mentioned a moment ago, there was only one objection. But most importantly, the form of the protocol was suggested by ComputerShare. That is to say, they submitted the protocol that they wanted in order to protect their interest as the custodian. And in their answer, which was filed on December 31st of 2013, they admitted the turnover at that time. They admitted what? The turnover. They admitted the duty to turnover. And they said they were sympathetic to the rights of the violas and attempting to collect on this judgment. At that point, there was only time. When the time to object expired, there was a motion on February 3rd, 2014, to finally complete the turnover. And on February 12th, 2014, the trial court entered a turnover, which completed the last act necessary in the process. And in that act, the form of order that was – there were two competing forms of order. There was a dispute as to how much time ComputerShare needed in order to assemble the securities and turn the vote. We suggested 30 days was sufficient. They wanted 60 days. The trial courts accepted their form of order, entered that order. Counsel, let me just – you started off by saying that there were three different types of accounts that you were seeking to collect on. Correct. And these orders go to two of those. So you're describing the protocols that were put in place for the two. Right. Because I'm trying to lead to the point – on this one, at least, Your Honor. You're trying to get to the point of why, since only two of the three were acted upon, it's final? That's right. Because – well, the point – and the point is this, that in a post-judgment proceeding, obviously you have to look at finality relative to the asset being seized, relative to the ownership of that asset. Once that asset is taken, the turnover order is complete. All that is done when that asset goes. There's some suggestion in some of the briefing that, no, you have to wait until the last act of collecting. Until the judgment either expires on its terms or the judgment is paid in full. And only then do you have a final order. And I don't believe that is a reasonable interpretation. That's what we've said in all the cases that say that a turnover order is a final judgment when that act is complete. Why does that make sense? Why does the argument I just made make sense? 70 account holders. If you, let's say, complete everything with respect to 37 of them, they're done. They're over. They have separate claims. They have separate rights. They're not tied to anything. They're not to the judgment. Cube is done. They're default. The question then becomes, there was a separate question. We agree on the certificated shares. And the question that was open on the certificated shares was, what was the bond? So there was still judicial action to be taken on the certificated shares that was not required for anything else. And the point of the matter is, is that still a judicial act with regard to the other two categories of shares? That would keep the matter open. We think that for turnover proceedings, there are turnover proceedings must occur in sequence and in a multiple of ways. And there are different accounts of different account holders that are affected by it. But how many appeals could be brought? Well, presumably, let's just say. On your view. Yes. If Mr. Smith lost his securities, the argument would be if he didn't have a right to appeal until everything was over, Mr. Smith might not be able to make an appeal for years. No, no. That's not what. How many appeals are you contemplating are permissible? Oh, as far as I'm concerned. Every single asset, a separate appeal could be made? Well, theoretically, it could. But in reality, what we're talking about is probably two. And the fact that that was the first appeal would be untimely. That is to say. But for purposes of understanding the Rule 54B and how to interpret it. Right. The logic of yours is that with respect to every account holder and every asset, that's just treated as a separate case? That would be correct. That's the way I believe it should be treated. And in some courts, at least, the cases are then separated out in order to achieve that mechanical function. And when they're not, why would we treat it as if they were? Well, you know, I've had the benefit of sitting in here this afternoon, this morning, and listening to the arguments. And sometimes one of the comments was, why should we not look at it in a real-world application? And what I'm saying to you, in a real-world application, when you are enforcing a judgment, if I'm going after one set of assets which have no relationship to another set of assets, different owners, they should be treated separately. But why didn't you bring it separately? Why wasn't it separated out to begin with? We actually did separate it out because we said we did the book and the cash shares on one set of protocols and the certificate shares on a different set of protocols. But in the real world, why wouldn't you ask for 54B ruling on those that you think are final? And then you wouldn't be here if you had gotten that because the time would clearly start running. Well, we believe that that's what we had when the judge basically entered the order on February 12th. The mistake that we made. 54B has two components. One, that everything's done. And the other, that there's no just cause for delay. Right. I mean, so Part B is as important as Part A. I understand, but the point there basically says, would have us argue that this collection proceeding was, albeit filed in one number, was something other than it was, which was essentially an effort to go after 70 separate accounts with separate rights in each one. For example, in the underlying case with the trial court, we were required to identify. Maybe I'm just missing something. Since you can get a special certification, doesn't that mean the rule is contemplating exactly this situation, which there's a lot of things amalgamated together, and the way you're supposed to deal with that is get the separate certification? Otherwise, if we're supposed to treat all these things that are amalgamated as if they're not, there would never be a need for a separate certification, would there? The only point I'm making there is. What's the answer to that? Well, the answer is that if we are saying that in a post-judgment collection proceeding, these same set of rules now apply, because I think that 54 of that certification does not really seem to me to speak in terms of post-judgment collection. One of the things that's different, for example, is that in post-judgment collection, we adopt the state rules in terms of enforcement, which is the only place in the federal rules that adopt the state rules. So what I'm trying to say to you is there is an inherent difference. Recognize that when you're on the collection side, because you adopt the state collection procedures, because there are nothing on the federal side that gives you to do that. Nothing in the rule tells us to do that. I'm not saying that that means it's a bad argument. I'm just saying, in fact, nothing in the rule tells us to do that. I believe the rule expressly says that the state rules apply. Yeah, but the rules of civil procedure apply in the federal courts, don't they? Except that the mechanisms for collection are governed by state rules, and some of them have procedural aspects to them. But I'm saying Rule 54 on its face doesn't distinguish between post-collection and pre-collection. I agree that Rule 54 is – So you're asking us to read Rule 54 not to apply in the post-collection circumstances? That's what I'm suggesting, yes, sir. And do you want to – Is 2020 better than that? Yeah. You know, I'd really love to. And I know that in bankruptcy court, there's some precedent, but I can see how that would be different. But I think I have to be candid enough to say I've given you the best argument I know how to give you. And I've given you the best law I can. So let me move into – I may not be doing it that well, but there are other points I think I hope to do better. So let me move to those other points. If we now turn to the issue of what the trial court did, and assuming it had the right to revisit its own orders, and it could reexamine all those time issues no longer apply, the question then becomes, what is the issue involved on collection of these assets? And that's why the notice protocol was so important. And the reason that is is because the trial court announced that as a matter of public policy, the trial court was concerned about the due process consideration that was in effect by these Cuban laws that took this property theoretically without compensation. Now the problem with that finding is that it is an expressed derogation of what the Supreme Court of the United States in Belmont said was the public policy under identical circumstances, which is the due process and compensation issues when you deal with something outside the United States is not the public policy of the United States at all, period. So we have to basically search for public policy someplace else. So now we go to, it's almost embarrassing to deal with cases that are this archaic, but sometimes they're pretty good. And in this case, the issue was essentially what is the effect of legislation, TRIA, the Terrorism and Risk Insurance Act, with regard to the right to collect, and is that a binding public policy under these circumstances? Before TRIA was enacted, it was the government of the United States' position through statements of interest filed again and again, and I guess it still is, opposing efforts to collect. But they said, don't let it happen. And TRIA was a direct reaction to that. Senator Harkin in his comments said that this can't be the case. That's not what we want to do. We want to make sure that victims of terrorism have the direct path of being able to enforce their judgment against frozen assets. But the frozen assets in question, were they not, were indisputably the frozen assets in, let's take this case, Cuba, whereas the issue here is whether they are to be recognized as Cuban assets. Yes. So Senator Harkin was not addressing this situation, was he? I actually think that if you're saying did he have in mind the Cuban confiscation laws, I don't find that in his comment. But what he did have in mind was that it is indisputable that the property against which the judgment should be satisfied is the property of the responsible party. Correct. And that, in fact, is the issue before us. We cannot start without assumption. That's correct. Now let me just move to the issue. Okay. We have to ask ourselves what force, if any, is this court going to give to those Cuban laws? And that's where the notice protocol comes in because that's why you have claimants to the fund. In other words, by giving the notice protocol, every single one of the 70 original claimants had the opportunity to simply write a letter to the court and say, I still claim an interest in the fund. But you've got a real world problem again. This keeps coming up. Those letters were sent to Cuban addresses as they were, I believe, around 1960. And I don't think anyone realistically expects that, in fact, they were providing notice. Addresses change. Which is why there was notice published, which was approved by the court, in the International Herald-Tribune that's published virtually every place in the world. And I will tell you that three claimants came forward because they did, in fact, get the notice, which is evidence of the fact that the process worked. Three out of 70? Pardon? Three out of 70. Three out of 70? Because those are not the odds you want if you're in a casino. The odds I sometimes get when I'm in a casino. Or running for president. Or running for president. But the fact of the matter is, the point that I am making is that the process allows these people to come forward. Now, one of the things that you have, the reality is, is that you have death. You have people disappear. You have people that abandon their interest. But now we go to what was the purpose of those two laws. And that hasn't been controverted in this record. Cuba was facing a flight capital in 1959. When the Castro Revolution commenced, people with money literally took their wealth and sent their wealth offshore. No question about that. And as a result of that, in its agricultural-based economy, they were suffering from a severe financial crisis in terms of having enough money in order to acquire the capital goods necessary to support that economy. So as a result, they basically prospectively said, bring your money back to Cuba. You get to keep it. It's yours. Nobody's taking it. But they also then said nine months later, if you fail to do it, we confiscate it. So essentially it was coercive. And I'd invite the Court to our briefs where we develop the cases on that point, particularly the New Jersey case in Saco that deals with that and talks about coercive as appropriate. Thank you. Thank you, Counselor. May it please the Court, Benjamin Schultz on behalf of the United States' amicus curiae. Michael Gilleran will also be arguing on behalf of ComputerShare. The United States has participated in this case primarily to address the act-of-state doctrine. And that is because, as the District Court saw the case, and as plaintiffs have not disputed, the only way that Cuban law applies in this case is if the extraterritoriality exception to the act-of-state doctrine applies. We think that the answer, as the District Court recognized, is that the extraterritoriality exception does not apply. And the first place to begin is in the Supreme Court's decision in Sabatino, where the Court explained that the general understanding of the act-of-state doctrine is that it's something that applies only to assets that are located within the territory of the foreign state. And that makes sense if you look at the policy rationale for the doctrine itself, which is about respecting territorial sovereignty. There may be rare circumstances in which courts have applied the extraterritorial exception and said that it applies even to assets located outside the country. But those are truly rare circumstances. And indeed, it's not clear even that some of those Court of Appeals cases have survived the Supreme Court's later decision in W.S. Kirkpatrick where the Supreme Court cabined the act-of-state doctrine. But regardless, if you look at those cases, you'll see just how rare a situation it is in which the act-of-state doctrine would apply extraterritorially. In Belmont, for example, you had the United States itself acting as the plaintiff and telling the court that to effectuate U.S. foreign policy, the court should give effect extraterritorial to an act of the Soviet government. Here, of course, the United States is saying just the opposite. We're informing the court that U.S. policy would not be furthered by invoking the extraterritorial exception. And at least at the very minimum, we think that that is entitled to wait and perhaps at least as dispositive as to the extraterritorial aspect. The government's argument as to why you're arguing that there's no interest in enforcing it is what? Well, it's several things. And so part of what the government's foreign policy interest here is that the assets here happen to be assets that are blocked under an economic sanctions program. And it's the view of the executive branch that keeping those assets blocked is important because, among other things, it serves as a bargaining ship in international negotiations. And so if the court were to recognize the active state doctrine here and ultimately conclude that these assets should go to the plaintiffs, then we think that that would harm U.S. foreign policy interest. But in addition, there's another important policy here, and that's the policy which we think is included within TRIA. And the judicial court recognized that part of what TRIA is trying to do here is it's trying to make the terrorist country actually feel the impact of its judgment. But what the plaintiffs are trying to do is they're trying to take assets that U.S. law otherwise would not be determined is owned by Cuba and then take assets that otherwise wouldn't be owned by Cuba. But that seems that that argument does suggest trying to figure out whether that's relevant to the active state doctrine because in the earlier part of the colleague between Justice Souter and the counsel for the other side, one way to read TRIA in the comments from Senator Harkin is that the United States is indifferent as to the ownership of any particular asset. What TRIA is interested in is ensuring that Cuba pays the damages it owns under TRIA. And in this case, the question is, are they Cuban assets or not? And I don't see how TRIA can be the source of the conclusion that they're not Cuban assets. I mean, if it's good for that side, it should be equally true here. I understand the sanctions argument, but the TRIA argument seems a bit of a leap to say that that's part of what we have to defer to in applying active state. Well, perhaps it's better to back up here, and I think it's important to understand the posture in which the case reaches the court. The case reaches the court under the district court's understanding that unless the extraterritoriality exception to the active state doctrine applies, Cuban law would not apply. So in other words, as we've understood that, and I don't see anything in the plaintiff's brief that disputes this, so as we have understood that, whether you think that TRIA applies federal common law or you think that it applies state law, perhaps with regard or without regard to its choice of law principles, whatever you think it is that TRIA is telling you to do to apply ownership, that answer is not Cuban law. That was, we think, the premise that had to be the premise of the district court's opinion. So once you accept that, then the only question is, notwithstanding the fact that whatever the relevant law is that TRIA would tell you to apply, if that's not Cuban law, do you think that the active state doctrine, nonetheless, compels you to choose Cuban law? But I think wouldn't the question be, did TRIA have a view of whose assets they were? If, under active state doctrine, not looking at TRIA, it would be treated as a Cuban asset, and what you're sort of saying is to figure out what TRIA thought was supposed to take TRIA's policy interest in construing the active state doctrine doesn't make a lot of sense to me. Let me try and maybe I'm not articulating this right. Let's, I think, and perhaps I'm wrong, so tell me if I've misunderstood Your Honor's question, but I think it's common ground here that as the case reaches this court, if you just looked at TRIA itself, ignoring the active state doctrine, whatever law TRIA would tell you to apply, that that law would not be Cuban law. Well, I guess what I'm asking is, you acknowledge there are circumstances in which the active state doctrine could apply extraterritorially. Very rare circumstances, yes. So I would assume TRIA contemplated that circumstance. Well, that's hard to see because TRIA- Well, I wouldn't attack it. It's a possibility. In other words, nothing about TRIA seems to me a basis for concluding that it's not going to be treated extraterritorially. I think the premise to Your Honor's question is the premise that TRIA is making some sort of choice of law judgment. If that were true, then I don't see how the district court concluded, could have concluded that plaintiff's case rises or falls on the active state doctrine. I'm not saying TRIA compels a conclusion for the plaintiffs, for the people seeking it. I'm just saying I don't understand, for purposes of how we understand active state doctrine, how TRIA can be a source of concluding whether or not to give effect to the active state. If there's a separate foreign policy interest of the United States, I get that, which is the sanctions argument. There is, and I just want to be clear. I think that sanctions interest is sufficient and should control the case, certainly especially given the deference that the United States, we think, merits here. But to answer your question, some of the policy underlying TRIA is the idea that you want the terrorist country to feel the pain itself. These are assets that nobody thinks that Cuba has dominion over. It's not like Cuba could one day wake up and say, wouldn't it be great if we spent all the money that was in ComputerShare's account and used it to advance whatever policies of Cuba they wanted to. Of course it can't, and that's because these are assets that are located in the United States, and as far as anybody was concerned, if it wasn't for TRIA, then presumably after the unblocking was done, ComputerShare would dispose of these assets as the account holders directed it to. So given that it's not like this is something that Cuba has, it's hard to see how Cuba would be feeling the pain of its terrorism if these assets were ultimately forfeited to the plaintiffs. And quite the contrary, if anybody would be feeling the pain of the forfeiture, it would be the individual account holders. I guess what I'm asking is, is this even in the interest of the United States to make this argument? Because at the limit, it would suggest that if you were trying to make an argument, as in the Russian case, that was in the foreign policy of the interest of the United States to treat it as a Cuban asset, that TRIA would suggest that under the Act of State doctrine, we couldn't. And that seems like an argument that I don't think, I don't quite understand why the United States would want that to be the case. I would think you would want it not to be a TRIA-based argument, but to be an argument based on what the foreign policy interests of the United States are, which is what we normally defer to. We think the foreign policy interests of the United States are in and of themselves sufficient to decide the case, and we would ask that the court defer to that. To the extent that they have also made arguments based on TRIA, that's why we've also added those arguments. But if the court doesn't want to address those and wants to decide the case solely on the sanctions, that would be perfectly fine. I don't know if the court wants me to address Rule 54. Otherwise, we would rest on our briefs. Thank you. Thank you. May it please the court, my name is Michael Gilleran. I am here on behalf of Pelley Computer Share, which is also the trustee process defendant in this case. And Computer Share is a national transfer agency. It is also a custodian of the shares and assets of the Cuban nationals in this case, assets which the Valdos, the Apelans, are seeking to seize by way of trustee process, by implication, by use of Cuban confiscatory laws 567 and 568. And in this case, I am here perhaps indirectly on behalf of the Cuban nationals. And in this case, the Cuban nationals owe no judgment to the Valdos. They've done them no wrong. And, in fact, one of them, Katie Ochoa, who filed an affidavit in the lower court, the assets which the Valdos seek to seize here are her life savings. And so we say that the Cuban nationals are innocents and that what's going on here is confiscation of the assets of innocents with no showing of wrongdoing, of liability, of any wrong on their part whatsoever. Well, Counselor, you had originally agreed to this, right? Your Honor, we didn't agree. So maybe you want to argue what Congress is doing. What the confucius interest in this litigation might be. Your Honor, here's what actually happened. That's an incorrect statement of the factual record. We were served with a trustee summons which asks one question. Do you have these assets? We said, yes, we have these assets. In our answer, there's nothing that says these assets are your property. These assets were subject to trustee process. We are legitimately subject to trustee process. There's no legal conclusion in our answer whatsoever. All we say is, yes, we have physical things that you are seeking. We didn't agree to be a trustee defendant. We agreed to nothing. And so, Your Honor, I think that that statement by the Valdos Counsel is, I would say, flatly inaccurate and not supported by the record. What happened was that after we did answer, we expected, as under Massachusetts law provides, that there will, in fact, be a court determination as a matter of law as to whom the assets belong. And that, in fact, did happen. So, Your Honor, the idea that we were somehow bound by our answer and agreed to everything they wanted and were not allowed any further role in the proceedings, that's simply not supported by the record or by law, Your Honor. If I might also say that – I'm sorry, I don't want to delay with this. Did you argue, like you're arguing now, that this wasn't subject to seizure? Your Honor, that's a – Or a trustee process? With our answer – For the district court? In our answer, did we do that? No, Your Honor. But that trustee process answer under Chapter 246 doesn't call for argument. It doesn't call for a legal brief. It simply says – it's Chapter 246, Section 20. It simply says, do you have the assets? It doesn't require us to go into an immediate defense. And I would say, Your Honor, Massachusetts case law is emphatic that it is for the plaintiff to affirmatively prove, for them to prove, that not only do we have the assets they seek, but that those assets are the property of the defendant in this case, in this case Cuba. Those assets are Cuba's property. It's not our – it is their job to prove all that. Those things were yet to happen after we filed our answer, were yet to come, and they never proved it. So, Your Honor, our answer is simply an answer and nothing more. We weren't bound by that. We gave up no rights. But going back to the question that they raised, the judgments – sorry – the turnover orders below, Your Honor, the law is quite clear that an order of a court which only decides part of the issues in a case, which doesn't decide the whole case, which doesn't end the case of the merits, is simply not a final judgment. Under Rule 54, that issue, there must be a final judgment before the court below could not reconsider what it had already done. As we already know, there's no 54B separate certification, as you yourself said. What happened here was on December 31, 2013, we answer. We say we've got cash, we've got book shares, and we've got certificated securities that we can control. By that date, that issue was in the case. The turnover order, which followed on early February 2014, said nothing about the certificated shares. The certificated shares were in the case. And in addition, that order also noted that there was an objector and there would be further hearings with respect to that objection. So the situation, Your Honor, was after even that February 2014 period, on March 10, 2014, they file a motion. So after the last order they say is a judgment, after that date, they file a motion to compel us to turn over the certificated shares on March 10. On April 11, they file a motion to complete turnover, the certificated shares and the other assets. So by even April 11, none of this was resolved. So if you then apply the test for a final judgment, which is an objective test, Your Honor, is everything resolved? Is everything complete? Are there no further proceedings? None of that is true. So we would say, Your Honor, that there was no final judgment entered by February 2014, and the court below was free to revise its prior orders as it did. Unless the court has further questions for me on the extraterritorial effect doctrine, I'm going to move to the issue of attorneys' fees. I think the courts quite covered that issue, and our position is pretty simple, which is the extraterritorial effect doctrine applies. The assets are in the U.S. It's found by the lower court. This isn't contested by the opposing side. Assets are here, and, therefore, the extraterritorial effect doctrine is simple. The foreign confiscatory law does not apply. End of story. By the way, there are also two further grounds for which a block the application of keeping law in the U.S., and one of those is the penal law rule, and the other is that they lack any private right of action. The penal law rule is simple, and it says that where the foreign law is primarily punitive in nature and not compensatory, U.S. courts should not apply it, and that's set forth in every statement third of international relations that section 483, I believe, comment B, and it's cited also in the papers of the U.S. government. What's the law here? 567, keeping law 567, says this law is a criminal law. It deals with criminal links of taking money, as Appellant said, taking money out of the country during a time of crisis. It's a criminal law, and it is to be enforced by the Cuban justice minister, the Cuban courts, and their own experts said that this enforcement by the Cuban courts and the Cuban justice minister indicates this is a criminal law. This is a criminal law. In addition, the assets, as confiscated, are to be paid into the Cuban National Bank, and they're to be used in the reconstruction of Cuba. So what you've got here, the law is a criminal law enforced by the government where the assets then are nationalized. So is that a law which is penal, or is it compensatory in nature? The answer is simple. Is it punitive or compensatory? It's criminal. It's nationalization. The penal law rule applies. Foreign law cannot be applied. One small further point. Appellants never answer our question below, was they have no private right under these Cuban laws. Private right of action, as this court well knows, it's got to be shown from either the text or the context of the relevant law, and the private right has got to aid enforcement of the law. Mr. Gilden. Sorry? I want to hear about your cross-appeal, please. Your cross-appeal. I will. I'll go there in just a second. You're running out of time, and I want to know if you think we should give you any money or what. Your Honor, we'd like that. I'll move on to that issue now. With respect to the cross-appeal, Your Honor, the first point is, is the July 7, 2015, order of dismissal, does it meet the separate document rule or not? The separate document rule set forth in Rule 58, and here's the sequence, Your Honor. July 7, 2015, this order is issued. The order says on it, in accordance with the court's memorandum and order dated July 7, 2015, it is hereby ordered that the above entitled action be and hereby is dismissed. That's all. That's all it does. The separate document rule, we filed our fee application not within 14 days. The 14-day rule is Rule 54D2B. We filed it within 24 days, 10 days later than 54D2B would say. However, Rule 58, the separate document rule says, if this is not a separate document, doesn't meet that rule, then we were not late. And we say we're not late, and here's why. The separate document rule has elements in it. It has elements, and those elements include the following. It must be, the rule itself must be mechanically applied, mechanically applied. It's formalistic. It doesn't look to intention. It looks to what's on the piece of paper. What's on the piece of paper must be complete, self-contained, and not refer to other documents. Complete, self-contained, and not refer to other documents. This is set forth in this decision of this court in Mullaney v. Chambers, relying upon U.S. Supreme Court decisions, and also in all the treatises, the Wright, Miller, and Cain treatise, the Moore's Federal Practice treatise. This rule is an element of the separate document rule. You can't, the separate document rule provides for a one-stop shop. It's a piece of paper. It's got to have all the parties, all the relief, all the parties, everything's got to be here in this one place. And when that happens, the parties know that the time period for appeals and motions has been triggered. Now, what have we got here? We look at the rule requiring self-containment and completeness and non-reference elsewhere. This is a trustee process action. Is there any indication here whatsoever that any trustee process action has been, any trustee process issue has been resolved? No. Is there any indication as to what's happened to the turnover orders, which were both in the memorandum order overturned? No. Is there any indication here as to what happened to the later motions they filed with respect to the certificated shares? No. This document is a reference. Go look someplace else for what's happened here because it's not here. This document then does not satisfy the elements of the separate document rule. The time period did not begin to run. Our filing on July 31st was not late, and we therefore ask that our fees be granted below. Also, we're going to ask for our fees be granted in this court under Rule 39.1B of the local rule where even arguably this late filing made any difference and wouldn't make a difference here. So we're seeking our fees not only in the lower court, error of law. We also argue in our papers in abuse of discretion, which is set forth there, I think, fairly completely. And we will also file a motion with this court's permission for our fees in this court. Unless somebody else has any questions, I think I'm done. Thank you. Thank you. Actually, the first time in my entire career where I've approached the bench with two iPads. So it just shows you what technology is doing in the real world. But I wanted to specifically refer to a couple of record references that came up in our group. I'd invite the court to specifically look at the record at the trustee's answer, which is R58. And in the trustee's answer, you will see nothing in the trustee's answer saying other than we will cooperate. We can turn over what we have, which are the cash and the book shares. We can't turn over the computer shares. There is nothing in that answer that opposes or raises an issue. That answer was never amended. I want to be very clear on that. The second point, which really goes to the major issue that we've been discussing today, is how we come to the conflict. The trial court announced, because the government invited the court to reexamine its choice of law, as a choice of law question, as to ownership. And I think that was the point you made, Justice Souter, which is where do we go to ownership? And the trial court said these two Cuban laws would clearly establish ownership in Cuba. So that became settled by the trial court. Then the question became, should the trial court then do something with it, that is to say, honor it or dishonor it because it's a penal law and ask for further briefing? In dealing with penal versus not, the policy of the United States, we have the conflict, which is TRIA says if it's Cuban property, we've been at the trial court said it is, then it should be used to pay the judge. The government argues conversely. It shouldn't be used to pay the government. It should be used as a bargaining chip. But they're kind of silent on exactly what that means. Now, certainly if you were to ask Cuba, do they intend their law to apply to that asset, the answer is they clearly do. I don't think it would be logical to say, well, you know, give us the asset back and we'll reverse this law that's been standing for 60 years. That's not logical. So it only becomes a bargaining chip for the government's purpose if in point of fact it is a Cuban asset. If it's not, Cuba hasn't shown huge interest in the effects of what happens to some of its citizens, particularly extraterritorial. So its bargaining chip is give it to Cuba, and that's where the TRIA public policy comes in. The policy issue under TRIA. If I follow where you're going, that would say the U.S. hasn't articulated any particular policy reason not to treat it as Cuba's. Okay. But why is that enough for you? Because the government's other argument and defendant's argument is they don't have to, because since it's extraterritorial, we would only treat it as Cuba's property if there was some special reason to do so. And the government's certainly not saying there's a special reason to do so. Well, that started with a choice. That started with a choice of law issue. In other words, the court correctly found that Cuba had a right with respect to its own nationals to employ a coercive law designed in order to prove its economic standing. It should give that effect. And the next question should be, and that's why it is a bargaining chip. What we really have is almost an illogical and inconsistent position because it can't be a bargaining chip in the international arena for Cuba on the one hand. No, but it can still be a bargaining chip if the United States reserves its position on the extraterritorial exception. It doesn't have to take the position now or at the beginning of negotiations with Cuba that it recognizes Cuban title. It can play its cards close to the vest, and it will still be a bargaining chip. Justice Zero, with all due respect, I think that the bargaining chip, at least my simplistic thinking, would contemplate, at least from what is publicly disseminated about the Cuba demands on bargaining, is what goes to Cuba stays with Cuba. And it seems to me that is all that they are interested in. I don't think that the idea that we'll be close to the chest plays any role in this particular situation at all. It is either Cuba's and a bargaining chip, or it is not. Thank you.